# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH HAMILTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV1341MLM |
| | ) | |
| GREGORY AND TONI PALM, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Defendants Gregory and Toni Palm (jointly, "Defendants" or "the Palms"). Doc. 35. Plaintiff Joseph Hamilton ("Plaintiff") has filed a Response. Doc. 44. Defendants have filed a Reply. Doc. 48. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 8.

## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn.

& E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Defendants' Motion.

## UNDISPUTED FACTS[1]

On May 8, 2009, Defendant Toni Palm ("Mrs. Palm") entered into a written contract with Mike Hamilton for the performance of certain work on the Palms' home and barn. The contract specified the work to be performed and that the Palms would provide all materials. The work was to be performed for the amount of $8,000. The contract specified that the contractor, Mike Hamilton, "at his discretion, [could] engage subcontractors to perform work [under the contract],

---

[1] The facts are undisputed unless otherwise stated.

provided [that the] Contractor [] fully pay said subcontractor and in all instances remain responsible for the proper completion of [the] Contract." Also, the contract provided that the contractor was to perform all work in a professional manner and "in compliance with all building codes and other applicable laws." The contract warranted that the contractor was "adequately insured for injury to its employees and others incurring loss or injury as a result of the acts of the contractor or its employees or others incurring loss or injury as a result of acts of the Contractor or its employees and subcontractors." Doc. 36-1.

Mike Hamilton was a self-employed contractor in the construction industry. He testified in his deposition that he did "some general contracting" where he "would actually hire [] other subcontractors," such as an electrician, a plumber, or "whatever [was] needed to pull permits." Doc. 36-2 at 85. Mike Hamilton further testified that during the period of 2008-2009, he was doing projects for clients in addition to the Palms and that, "at any one time," he would "probably average three" jobs. Doc. 26-2 at 87-88. Prior to the job which is the subject of this lawsuit, Mike Hamilton had performed other work for the Palms, including "fixing work that a prior contractor had done to repairing a fence," "a lot of drywall work, lighting, [and] moving lighting around." Doc. 36-2 at 88.

The project for the Palms, which is the subject of this lawsuit, involved roofing and siding work on a pole barn. Mike Hamilton testified in his deposition that Plaintiff was brought in as an expert on tin roofing, and that Plaintiff had more expertise than Mike Hamilton in "tin." Doc. 36-2 at 92. Plaintiff's son also came with him to work at the Palms. Plaintiff admits that Mike Hamilton paid Plaintiff's expenses to travel from Colorado to help on the project at the Palms' St. Louis barn.[2] Def. Facts, ¶ 25; Pl. Resp. Def. Facts, ¶ 25. Mike Hamilton testified that he provided a rental house

---

[2] The court notes that in response to other statements of undisputed facts Plaintiff states that Mike Hamilton "loaned" him $500 "so that he could make the trip to St. Louis. Pl. Resp. Def. Facts, ¶ ¶ 26-27.

3

for Plaintiff and his son while they were in town. Doc. 36-2 at 104. Mrs. Palm provided drawings and pictures showing what she wanted the barn to look like. The drawings provided by Mrs. Palm did not have any measurements or other technical details. Plaintiff testified that he wanted to use scaffolding when he and Mike Hamilton were working on the Palms' barn and that Mike Hamilton said it was not necessary. Because Mike Hamilton was in charge, Plaintiff went along with Mike Hamilton's decision. Doc. 36-3 at 68-70.

Mrs. Palm testified that Mike Hamilton wrote the specifications for the barn in the contract between them; that she and Mike Hamilton had a discussion about what they "hoped could be done"; and that Mike went back and wrote [the] proposal up and presented it" to her. Doc. 36-4 at 38-39. Mrs. Palm also testified that portions of the contract between herself and Mike Hamilton were modified. In particular, rather than her paying "10 percent down, 50 percent at start, [and] 40 percent at finish," it was decided that the Palms would pay as the project progressed. Doc. 36-4 at 39. Also, design aspects of the job were changed. For example, Mrs. Palm testified that the barn roof originally was to overhang approximately 36 inches; "what [the Palms] ended up with was what Mike [Hamilton] determined to be structurally sound and doable," which was about fourteen or fifteen inches. Doc. 36-4 at 40. Additionally, the front porch on the barn was made larger, from six feet to eight feet. Doc. 36-4 at 40. Mrs. Palm testified that in all other respects, the contract accurately set forth the terms of the agreement between Mrs. Palm and Mike Hamilton. Mrs. Palm testified that if she had been unhappy with Plaintiff's work on the barn job she would have brought it to Mike Hamilton's attention because he hired them. Doc. 36-4 at 36-37.

On five occasions, Mrs. Palm paid Charlie Johnson, who also worked on the job, for the work. She testified that she did this "either because Mike [Hamilton] was not around or Mike asked [her] to." Doc. 36-4 at 36. There were times that Charlie Johnson worked at the Palms' property

4

separate from Mike Hamilton. On these occasions, Mrs. Palm paid Johnson directly. Doc. 36-4 at 37-38.

The Palms contend that Mike Hamilton guaranteed Plaintiff that he would make a certain amount on the Palms' job and that the quicker it was finished, the less work would be required of Plaintiff for the agreed amount. The Palms also contend that Mike Hamilton told Plaintiff that if they finished the Palms' project in three weeks that Plaintiff could make $985 a week. Def. Facts, ¶ 27. Plaintiff responds to these assertions by stating that Mike Hamilton said things to him "to motivate him to come" to work at the Palms' job and that Mike Hamilton loaned him $500. Pl. Resp. Def. Facts, ¶ 27. Plaintiff and Mike Hamilton brought their own tools to the Palm job site. Plaintiff bought a screw gun and charged it to Mrs. Palm's account. He was going to pay her back for the screw gun, which he intended to take with him when he left St. Louis.[3] Mike Hamilton brought his own ladders to the job. Plaintiff testified that he did not bring a ladder. Mike Hamilton and Plaintiff did use one of Mrs. Palm's ladders while working on the project. The Palms did not set the Hamiltons' work hours and the Hamiltons would sometimes leave the Palms' job to work on other projects. The Palms are not in the construction business; Mr. Palm is in sales management and Mrs. Palm is a homemaker. The Palms did not withhold payroll or other taxes from the job price. They did not pay anything directly to Plaintiff for the barn job. He was paid by Mike Hamilton for the work at the Palms' home. On prior occasions, when Plaintiff had come to St. Louis to work with Mike Hamilton, he was paid by Mike Hamilton for the work he performed. Mike Hamilton told

---

[3] Plaintiff testified that his screw gun was not working; that when he and Mike Hamilton were picking up lumber which was charged to Mrs. Palm's account, he "picked up a screw gun"; that he put it on the same bill as the lumber; and that, when he got back, he told Mrs. Palm that he added the screw gun; that he was going to pay Mrs. Palm for the screw gun in that they would "settle up"; and that the screw gun was for his use in his jobs. Doc. 36-3 at 66-67.

Plaintiff that he would provide Worker's Compensation Insurance. Plaintiff found out after he was injured that Mike Hamilton had not purchased Workers' Compensation Insurance. Doc. 36-3 at 97.

Mike Hamilton believed that Plaintiff was his subcontractor, and he did not believe that Plaintiff was his employee or the Palms' employee. Doc. 36-2 at 124. Plaintiff testified that he thought he was an employee of Mrs. Palm; that she hired him; that she waited for him to "come out there to start the job"; that he did not have any written agreements with Mrs. Palm; that he knew she was not going to pay Social Security for him; that he thought that Mike Hamilton and Mrs. Palm were going to be providing Workers' Compensation insurance for him; that Mike Hamilton told him that he was going to provide Workers' Compensation insurance and that Mrs. Palm had "insisted on it for that job and he was going to do it"; that he received one payment from Mike Hamilton for the Palm job; and that the day before the first day he worked at the Palms' he had gone to other job sites with Mike Hamilton. Doc. 36-3 at 111-12, 114-15, 118. To the extent Plaintiff states that Mrs. Palm kept track of his hours, Mrs. Palm testified that she kept track of the hours the Hamiltons were present for a reference when Mike Hamilton asked for payments. Doc. 36-4 at 49-50.

The accident at issue occurred on May 17, 2009, when Plaintiff was working on the roof of the Palms' barn. Plaintiff was on one sheet of metal roofing, removing the screws from the edge of the sheet that he was on and from the edge of the next sheet. Plaintiff was unaware that Mike Hamilton had already removed some of the screws from the top of the sheet on which he was working. Plaintiff testified that when he took out the screw that was on the edge of the piece that he was on and the outside piece, his piece "just took off." He further testified that he "guess[ed] [he] removed one too many [screws], and it ripped out about ... eight or so screws." Doc. 36-3 at 80. Plaintiff slid to the ground "right on [his] head." He rode the piece he was on "all the way down to the ground." Plaintiff testified that he thought he was unconscious; that Mike Hamilton walked him

6

to the barn; that he was in extreme pain; that he sat in a chair, "trying to regroup"; that Mrs. Palm then told him that she made soup for lunch; and that this was the first time he had seen Mrs. Palm on that day. Doc. 36-3 at 81-84. Mike Hamilton testified that "around the time ... that all of this happened with [his] brother," the Palms asked him about Workers' Compensation coverage and he told them that he did not have coverage. Doc. 36-2 at 27.

Although Plaintiff contends that Mrs. Palm testified regarding her hiring individual employees to work for her, the testimony to which Plaintiff refers involves Mrs. Palm's testifying regarding the advantages and disadvantages of hiring smaller versus larger companies. Doc. 36-4 at 24. Additionally, as stated above, the contract provided that Mike Hamilton was to engage subcontractors to work on the job. To the extent Plaintiff denies that Mike Hamilton worked in the construction industry, Mike Hamilton testified that since leaving Lowe's, he was "basically working as a contractor, doing construction work." Doc. 36-2 at 83. Mike Hamilton also testified that for projects other than the Palm's barn, he had hired subcontractors; that when he needed an "extra pair of hands, [he] would get somebody that [he] considered dependable and [] trustworthy"; that he would subcontract these people to do work; that he "hardly ever" used a written contract, "except with the licensed people"; and that, with regard to Plaintiff and his son and Charlie Johnson at the Palms, "the subcontracting was done on a handshake." Doc. 36-2 at 86-87.

Although Plaintiff contends that Mrs. Palm was "insistent" that he work on the day of the accident, Plaintiff testified that Mike Hamilton told him that Mrs. Palm was "anxious because she wanted [them] to start the week before but [Plaintiff] couldn't get away, so to make a showing, [Plaintiff] and [his son] went [to the Palm's] that morning." Doc. 36-3 at 78. Although Plaintiff contends that Mrs. Palm instructed her workers regarding the number of screws and spacing of screws required for the metal panels to be affixed to the pole barn, Mrs. Palm testified that she

7

relayed recommendations from roofing manufacturers to Mike Hamilton and Plaintiff. Doc. 36-4 at 92. Additionally, Mike Hamilton testified that Mrs. Palm would tell him what she wanted and he would "try to come as close as [he] could to what [he] thought she wanted"; that structural matters were his "obligation" and "responsibility"; and that "the details of how many screws it took or what posts to use" was up to him. Doc. 36-2 at 116-17.

Plaintiff titles his Complaint as being for "Personal Injuries." He alleges, in a single Count, that the Palms were negligent in failing to provide him with a safe work environment; that the Palms hired him to perform inherently dangerous work on the top of a structure with a pitched roof; that, as result of the Palms' conduct in this regard, he fell from the roof and suffered injuries; and that, at the time he was injured, he was employed by the Palms. Docs. 1, 30.[4] In support of his previously filed Motion to Dismiss, Plaintiff stated that his Complaint *does not allege* that he was an independent contractor; that the Complaint *does allege* that he was an employee of the Palms, that the Palms hired him to do work that was inherently dangerous, and that they failed to provide him with a safe place to work; that his Complaint *does not allege* premises liability; and that, even if he were an independent contractor, the Palms are liable for his injuries. See Doc. 6.

In support of the pending Motion for Summary Judgment, the Palms argue that Plaintiff was not their employee; that, arguably, he was an employee of an independent contractor, Mike Hamilton; and that neither an independent contractor nor an employee of an independent contractor can recover damages against a landowner. In Response to the Motion for Summary Judgment Plaintiff unequivocally states that he does not allege that the Palms are liable pursuant to an independent contractor theory. Doc. 44 at 6 ("Plaintiff will not respond to Defendant's arguments on pages 3-4

---

[4] Document 30 merely amends Plaintiff's Complaint to state that the date he was injured was May 17, 2009.

because Plaintiff[']s claim is not based upon any independent contractor theory.").[5] As such, the court need not address such a theory upon considering the Palms' Motion for Summary Judgment. Also, in the Response to the Motion for Summary Judgment, Plaintiff argues that pursuant to the Restatement of Agency he was the Palms' employee.

## DISCUSSION

Plaintiff's claim against the Palms is based solely on his allegation that, at the time he fell from their roof and was injured, he was the Palms' employee. Whether Plaintiff was an employee of the Palms is a matter of law for the court to decide and may properly be decided pursuant to summary

---

[5] Missouri law provides that "a landowner hiring an independent contractor to perform work is generally not liable for the negligence of the independent contractor or of the contractor's servants." State ex rel. Union Elec. Co. v. Dolan, 256 S.W.3d 77, 84 (Mo. 2008) (citing Matteuzzi v. Columbus Partnership, L.P., 866 S.W.2d 128, 130 (Mo. 1993)). An exception to this rule arises where the landowner "control[led] the jobsite and the activities of the contractor." Dolan, 256 S.W.3d at 84. The landowner control exception provides that the landowner will be liable if he exerts *substantial control over the premises and the activities of the independent contractor.* Dolan, 256 S.W.3d at 83 (citing Matteuzzi, 866 S.W.2d at 132). "[T]he [requisite] control must go beyond securing compliance with the contracts; the owner must be controlling the physical activities of the employees of the independent contractors or the details of the manner in which the work is done." Id. (quoting Matuezzi, 866 SW.2d at 132). The court notes that the undisputed facts, as set forth above, establish that the Palms did not control the technical aspects of the job; that the contract between Mike Hamilton and Mrs. Palm provided that Mike Hamilton was responsible for proper completion of the job and to assure compliance with applicable codes and laws; and that Mike Hamilton determined that a scaffold would not be used.

A second exception to the rule that a landowner is not liable for injuries suffered by the employee of an independent contractor arises when the work to be performed is inherently dangerous. Under this inherently dangerous activity exception, a landowner may be liable "to *innocent third parties* resulting from the failure of the independent contractor to take special or reasonable precautions against the inherent risks or dangers." Dolan, 256 S.W.3d at 84 (emphasis added). This exception applies only to innocent third parties, not employees of an independent contractor. Id. at 84. As discussed above, Mike Hamilton testified that he was an independent contractor. Additionally, the court finds below that Plaintiff was not the Palms' employee. Further, Missouri law is clear that if Plaintiff, himself, was an independent contractor and not Mike Hamilton's employee, he may not recover from the Palms, the landowners. See Lawrence, 957 S.W.2d at 405 (holding that, as a matter of law, "an independent contractor may not recover against a landowner for his own injuries under the inherently dangerous activity exception").

9

judgment. Wortham v. Am. Family Ins. Group, 385 F.3d 1139, 1141 (8th Cir. 2004) citing (Lerohl v. Friends of Minn. Sinfonia, 322 F.3d 486, 488 (8th Cir. 2003)). The court in Trinity Lutheran Church v. Lipps, 68 S.W.3d 552, 559 (Mo. Ct. App. 2001), held that, pursuant to Missouri law, the Restatement (Second) of Agency, § 220(2) (1958), controls a determination of whether an individual is an employee and that, therefore, the factors relevant to such a determination include:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; (j) whether the principal is or is not in business.

(quoting Keller v. Mo. Baptist Hosp. of Sullivan, 800 S.W.2d 35, 38 (Mo. Ct. App.1990)).

Additionally, the Restatement (Second) of Agency, § 220(1), states that "[an] [employee][6] is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." Additionally, the comments to § 220(1) state, in relevant part, that:

> c. Generality of definition. The relation of master and servant is one not capable of exact definition. It is an important relation in that upon it depends the liability of the master to third persons and to his employees under the provisions of various statutes as well as under the common law; the relation may prevent liability, as in the case of the fellow servant rule. It cannot, however, be defined in general terms with substantial accuracy. The factors stated in Subsection (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation.

---

[6] Subsection (1), quoted above, uses the term "servant" rather than "employee." Comment "g." to Subsection (1) of the Restatement (Second) of Agency, § 220, states that the word "employee" has displaced "servant" and that, in general, these terms are synonymous.

10

Not insignificant for this case where Plaintiff also has a Workers' Compensation claim pending, the factors set forth in Restatement, § 220(2), are relevant to a determination of whether an individual is an "employee" pursuant to Missouri Workers' Compensation statute. See Ceradsky v. Mid-America Dairyman, Inc., 583 S.W.2d 193, 196 (Mo. Ct. App. 1979) ("Our courts, as virtually all others, have adapted the definition of Servant worked out for vicarious tort liability purposes by Restatement of the Law of Agency Second (s 220) to derive a definition of Employee for workmen's compensation or other statutory purposes.").[7]

First, pursuant to § 220(2) of the Restatement, factor (a), the undisputed facts, including the terms of the contract, establish that the Palms did not exercise considerable control over the job. In this regard, Mike Hamilton was responsible for utilizing subcontractors to complete the job, for assuring that the subcontractors performed the work, and for assuring that the job was completed in compliance with all building codes and applicable laws. Also, the undisputed facts establish that Plaintiff was not a party to the contract; that the Palms did not set Plaintiff's hours; that, in fact, on the day of the accident, it was Mike Hamilton who told Plaintiff to go to work; and that Plaintiff did not work exclusively for the Palms while the job was ongoing. Significantly, the undisputed facts establish that the Palms were not was responsible for the technical aspects of the job; that this responsibility was Mike Hamilton's; and that Mike Hamilton, not the Palms, determined how the job was actually to be completed so that it was structurally sound while providing the Palms with the look which they wanted. Mrs. Palm's simply selecting the appearance of a project, including providing Mike Hamilton with sketches, did not create an employer/employee relationship between the Palms

---

[7] As set forth in Ceradsky, 583 S.W.2d at 196, other factors may be relevant under the Missouri Workers' Compensation statute to determine employee status.

11

and Plaintiff. See Owens v. Shop 'N Save Warehouse Foods, Inc., 866 S.W.2d 132 (Mo. 1993) (en banc) (holding that the landowner's merely selecting the color of paint did not place her in control).

Second, pursuant to factors (b), (c), and (d) of § 220(2), the undisputed facts establish that Mike Hamilton was a self-employed contractor in the construction industry; that Mike Hamilton, not the Palms, contacted Plaintiff, paid for his travel to St. Louis to work on the Palms' project and provided him with a place to live while he was in St. Louis; that Plaintiff was sought out for his expertise in metal roofing; and that neither roofing nor construction is the regular business of the Palms.

Third, pursuant to factors (e) and (f) of § 220(2), the undisputed facts establish that the Palms did not provide Plaintiff with tools, with the exception of the screw gun which Plaintiff intended to ultimately pay for and keep; that the project was at the Palms' home, not a commercial location; that Plaintiff worked on other jobs with Mike Hamilton while he worked on the Palms' job; and that Plaintiff intended to return to Colorado after the Palms' job was completed.

Fourth, pursuant to factor (g) of § 220(2), the undisputed facts establish that the Palms did not pay Plaintiff directly; that the Palms did not withhold taxes from the amount paid for the project; and that, pursuant to his contract with the Palms, the Palms were to pay Mike Hamilton a fixed amount for the job.

Fifth, pursuant to factor (i) of § 220(2), to the extent Plaintiff testified that he believed he was the Palms' employee, it is undisputed that Mike Hamilton told Plaintiff that he would provide Workers' Compensation Insurance for him; that Mike Hamilton paid Plaintiff; that, at the very least, Mike Hamilton said things to Plaintiff "to motivate him to come from Colorado to work at the Palms'" project; and that before the Palms' job, Plaintiff had worked on other projects for Mike

Hamilton. Mike Hamilton testified that he believed that he was an independent contractor responsible for hiring others and that Plaintiff was not either his or the Palms' employee.

As such, considering the factors set forth in the Restatement, § 220(2), the court finds that the undisputed facts establish that Plaintiff was not an employee of the Palms.[8] See Trinity, 68 S.W.3d at 558. The court finds, therefore, that summary judgment should be granted in favor of the Palms.

## CONCLUSION

The court finds that the undisputed facts establish that Plaintiff Joe Hamilton was not an employee of Defendants; that Plaintiff Joe Hamilton is not entitled to recover under the inherently dangerous condition doctrine; and that, therefore, summary judgment should be granted in Defendants' favor.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendants Gregory and Toni Palm is **GRANTED**; Doc. 35.

**IT IS FURTHER ORDERED** that a Judgment incorporating this Memorandum Opinion shall issue on this same date.

Dated this 21st day of April, 2011.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

---

[8] For purposes of this case the court need not determine whether Plaintiff was an independent contractor, as opposed to an employee of Mike Hamilton. Additionally, the court notes that although Plaintiff had suggested in his Motion to Dismiss that a decision of this court regarding his assertion that he was an employee of the Palms is not binding on the Division of Workers' Compensation, the Missouri Supreme Court held in McCracken v. Wal-Mart Stores East, LP, 298 S.W.3d 473, 479 (Mo. 2009) (en banc), that a trial court considering a personal injury claim has jurisdiction to determine whether the claim involves an employer/employee relationship for purposes of Missouri Workers' Compensation Act.

+